MARTHA HOSMER, as Administratrix of the Estate of EVERETT HOSMER, Deceased, Respondent, *v.* BYRON C. CARNEY et al., as Executors of HENRY CARNEY, Deceased, Appellants.

Negligence — injury by animal — contributory negligence — death of intestate by kick of horse — owner of horse not liable when decedent had as full knowledge of horse and his habits as owner thereof.

It is alleged that plaintiff's intestate was killed by the kick of a vicious horse which was owned by defendants' decedent. The intestate had used the horse in working the farm of defendants' decedent for a period of four months and had all the information as to the horse which was in possession of the owner. The only evidence that the horse had ever kicked, before the occasion in question, was within the knowledge of the person who was killed. *Held, first,* that the evidence did not justify a finding that up to the time of the accident the horse had a vicious habit of kicking or that the owner knew or ought to have known it had such a habit; *second,* that the doctrine of contributory negligence applies to the case of injury by domestic animals, and it was error to refuse to charge that even though the horse was vicious and the defendants' testator knew it, and failed to warn plaintiff's intestate of that fact, yet if the deceased

had knowledge of the vicious propensities and character of the horse, the plaintiff could not recover.

Hosmer v. Carney, 187 App. Div. 923, reversed.

(Argued December 4, 1919; decided February 24, 1920.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 29, 1919, affirming a judgment in favor of plaintiff entered upon a verdict.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Carlos C. Alden* and *Don Vroman* for appellants. The horse was not a vicious animal, and the injury claimed to have been suddenly inflicted by it was not to be anticipated from its history and does not cast responsibility upon its owner. (*Brice* v. *Bauer*, 108 N. Y. 425; *McHugh* v. *Mayor*, 31 App. Div. 299; *Lawler* v. *French*, 2 App. Div. 140.) There was no evidence to establish *scienter*. (*Van Leuvan* v. *Lyke*, 1 N. Y. 515; *McHugh* v. *Mayor*, 31 App. Div. 299; *West Chicago R. Co.* v. *Walsh*, 78 Ill. App. 595; *Reynolds* v. *Hussey*, 64 N. H. 64; *Hanover Nat. Bank* v. *Am. Dock Co.*, 148 N. Y. 612; *Creamer* v. *McIlvaine*, 89 Md. 343; *Bennett* v. *Mallard*, 33 Misc. Rep. 112.) The evidence established an assumption of risk by plaintiff's intestate as matter of law. (*Woodward* v. *Loomis*, 64 App. Div. 28; *Bessemer Land Co.* v. *Dubose*, 125 Ala. 442; *Lynch* v. *North Yakima*, 37 Wash. 657; *Mfrs. Fuel Co.* v. *White*, 122 Ill. App. 527; *Green, etc., R. Co.* v. *Bresmer*, 97 Penn. St. 103; *Wooster* v. *Bliss*, 90 Hun, 79.)

*Hamilton Ward* and *Irving W. Cole* for respondent. There is evidence to support the verdict of the jury that defendant not only had sufficient knowledge to put him on inquiry as to the vicious propensities of the horse, but also that he had actual notice. (*Fitzgerald* v. *Warholy*, 109 App. Div. 606; Shearman & Redf. on Negligence, § 532; *Reynolds* v. *Hussey*, 5 Atl. Rep. 458; *Dixon* v. *McCoy*, 39 N. Y. 400; *Lynch* v. *McNally*, 73 N. Y. 347;

*Talmadge* v. *Mills*, 80 App. Div. 382; *Campbell* v. *Page*, 67 Barb. 113; *Helmke* v. *Stetler*, 69 Hun, 107; *Gladman* v. *Johnson*, 36 L. J. C. P. 153; *Barclay* v. *Hartman*, 43 Atl. Rep. 174; *Brown* v. *Green*, 42 Atl. Rep. 991.) There was no assumption of risk by plaintiff's intestate. (*Muller* v. *McKesson*, 73 N. Y. 195; *Lynch* v. *McNally*, 73 N. Y. 347; *Hunter* v. *Met. Express Co.*, 50 Misc. Rep. 158.)

McLAUGHLIN, J. This action was brought to recover damages for the death of plaintiff's intestate alleged to have been caused by the kick of a vicious horse. The complaint alleged that the defendants' testator purchased the horse " as a kicker * * *, knew that the said horse was a violent kicker and vicious in his habits and that he utterly failed and neglected to warn or advise the plaintiff's intestate of such fact." The answer put in issue this allegation of the complaint. The trial resulted in a verdict in favor of the plaintiff for $5,000. Judgment was entered thereon and an appeal taken to the Appellate Division, fourth department, where the same was affirmed, one of the justices dissenting, and defendants appeal to this court.

The rule which governs the liability of the owner of a domestic animal for personal injuries caused by it is well settled. He is not responsible for such injury unless the vicious propensities of the animal are known to him, or by the exercise of reasonable care the same could have been ascertained. (*Benoit* v. *Troy & Lansingburgh R. R. Co.*, 154 N. Y. 223; *Copeland* v. *Draper*, 157 Mass. 558.) If such animal be delivered by him to another, he must inform such person of the animal's vicious characteristics, so far as known, or ascertainable by the exercise of reasonable care. (*McGovern* v. *Fitzpatrick*, 148 App. Div. 34.) If such information be given, or the person to whom the animal is delivered knows, or before injury ascertains, the vicious character of the animal, the owner is not liable. (*Douglas* v. *Scandia Coal Co.*, 161

Ia. 180; *Sidwell* v. *Economy Coal Co.,* 154 Ia. 475; *Cooper* v. *Cashman,* 190 Mass. 75.) The liability of the owner is predicated upon his omission of duty in not imparting the information, but such omission does not render him liable if the negligence of the injured party contributed to the injury. Judge Cooley, in his work on Torts (at p. 701, 3d ed.), says: " The doctrine of contributory negligence applies to the case of injury by animals," and the same is asserted in section 639 of Shearman and Redfield on Negligence (6th ed.), also in Labatt's Master & Servant (§ 1143, 2d ed.), and has been recognized as a rule of law applicable to cases brought to recover for such injuries. (*Loomis* v. *Terry,* 17 Wend. 496; *Williams* v. *Moray,* 74 Ind. 25; *Woolf* v. *Chalker,* 31 Conn. 121; *Bessemer Land & Imp. Co.* v. *Dubose,* 125 Ala. 442.) Obviously, there can be no negligence on the part of the owner in not instructing a person as to that which he already knows; and if, before injury, such person ascertain all the information which could have been imparted to him, he is thereafter charged with knowledge thereof. He cannot complain of dangerous conditions of which he had become as fully informed as the owner. This seems too plain to require the citation of authorities, but see *Douglas* v. *Scandia Coal Co. (supra)* and authorities there cited.

Keeping in mind the rules stated, and applying them to the uncontradicted facts in the case before us, I think it will at once become apparent that the judgment under review is erroneous and should be reversed.

Henry Carney, the defendants' testator, entered into a contract with Everett Hosmer, plaintiff's intestate, by which the latter was to cultivate a farm belonging to the former, on shares, Carney furnishing the necessary horses. Some time in February, 1915, Hosmer informed Carney that he needed another horse on the farm; that he knew a horse which was " just what he wanted " and which could be purchased at a low price; that it was owned by one Rexicker; that he had spoken to him and

1920.]               Opinion, per McLAUGHLIN, J.               [228 N. Y.]

he said he would sell the horse; thereupon Carney, who was ill at the time and confined to the house, sent his son to see Rexicker, with the result that he drove the horse to Carney's residence; Carney had never seen the horse before and knew nothing of it until that time, and then he only saw it driven back and forth in front of his house a few times immediately prior to the sale. The horse was purchased, put in Carney's stable and the following morning delivered to Hosmer. Rexicker testified that immediately following the sale Carney asked him if the horse were all right and he replied, " I said as far as I knew. He asked me if he had the heaves and anything of that description. I said he is a little bit mean. That is what I bought him for. I bought him to be watched." A few days after the horse had been delivered to Hosmer he asked Carney if he could have it clipped. This was consented to and plaintiff's son clipped it, and while clipping either its head or one of its fore legs, it reared and knocked the clippers out of his hands. The son testified, and was not contradicted, that before the horse reared he cut its skin nearly an inch in length with the clippers and that made it jump. Immediately following the clipping the horse developed pneumonia, was taken to Carney's stable, and after the expiration of two or three weeks was returned to Hosmer, where it remained until after the accident in question. When the horse developed pneumonia a veterinary was called and he advised putting on two mustard plasters, one on each side of the horse. They were put on, a paper put over the mustard and then a blanket thrown on and a surcingle put around the horse immediately in front of its hind legs. In tightening the surcingle the horse kicked and this is the only evidence that the horse had ever kicked prior to the accident. Rexicker testified: " I don't remember the horse ever kicking." Another person who owned the horse for eight or nine years testified that he had never known it to kick, bite, strike or display any vicious

tendencies whatever. Plaintiff's witness Smith, who helped Hosmer on the farm, and at times took care of the horse, testified that up to the time of the accident he did not have trouble of any kind with the horse. There was some evidence to the effect that the horse did not behave well when being shod, and that a twist had to be put on its nose, but in this connection it also appeared from the testimony of the blacksmith and his helper, as well as another witness, that it was not an unusual thing for horses when being shod to behave in the same way; that frequently they had to put a twist on the nose. There was also some evidence to the effect — just when or under what circumstances does not appear — that the horse, while a person was looking in its mouth, had reared and struck at such person with his fore foot; but there was no evidence that this fact was ever communicated to the defendant's testator or his son. There was also some evidence to the effect that when the horse was bedded with straw, and the straw would tickle its legs, it would jump and prance around in the stall.

On the day of the accident Hosmer had worked the horse with another on the farm, ploughing or harrowing, and at the end of the day's work he drove the team to the stable. On entering the stable the horse in question went into the wrong stall. Hosmer went into the stall and backed it out and the horse then ran out of the stable. It was driven back by Hosmer and again went into the wrong stall. Hosmer went behind it, put his hand on its hip, and the horse kicked, striking him in the throat or face, and inflicting injuries from which he died a few days later. The horse was upwards of twenty years of age, had been worked single and double, and done various kinds of work. There is not a suggestion in the record that during all of this time it had ever injured any one by kicking or had kicked at any one; indeed, the only evidence that it had ever kicked prior to the accident was on the single occasion when the surcingle was put in

front of its hind legs and the uncontradicted evidence is that many horses will kick when a surcingle is thus placed.

The charge here is that it was a vicious kicker. The fact that it was troublesome to shoe, reared and struck at a person who was looking in its mouth, reared and knocked the clippers out of the hands of the person who was clipping it, or when its bed was being made would prance or misbehave when the straw tickled its legs, is, to my mind, of no significance. None of these things indicated that it was a vicious kicker.

I am of the opinion the evidence did not justify a finding that up to the time of the accident the horse had a vicious habit of kicking or that the defendant knew or ought to have known it had such a habit.

The case, in principle, is much like *Eastman* v. *Scott* (182 Mass. 192). There, the defendants had a horse which had been in their possession about a month and a half, during which time it had kicked one person in the stable. The court held that, assuming the fact of the single kick in the stable was known to the defendants, it was not enough to require the submission of the case to the jury; that it could not be reasonably inferred from that, and the conduct of the horse at the time of the accident, it had, before the accident, a vicious habit of kicking.

But if it be assumed that the horse were a vicious kicker, then the plaintiff was not entitled to recover, because her intestate had as much, or more, knowledge than Carney had on that subject. He did not need to be told what he already knew. Before the horse was purchased he knew all about it. He had for several years before frequently seen it and seen the owner taking care of it. When he called Carney's attention to the horse he told him it was just what he wanted and after the purchase said he was glad it had been made. While the horse was in his possession, Rexicker, the person who sold it to Carney, told the intestate the horse would bear watching; that it would strike and to look out for it.

The fact is uncontradicted that he was also told the horse kicked when they put the surcingle in front of its hind legs. Not only this, but the intestate had the horse in his possession from the last of February or early in March until the day of the accident — the 5th of June — during which time he had worked it on the farm, driven it on the streets, peddled farm produce with it, cared for it, had it shod, and must have become familiar with its disposition. It seems to me incredible, if the horse were a vicious kicker, he did not know it. Common sense, at least, would indicate that a farmer, who had for several years been familiar with horses, and worked them in various ways, would, during the time this horse was in the possession of the intestate, have ascertained its disposition. (*McGovern* v. *Fitzpatrick, supra.*)

I am also of the opinion that the judgment should be reversed because the trial court did not properly instruct the jury. At the conclusion of the main charge the court was requested to charge that even though the horse were vicious and the defendants' testator knew it, and had failed to warn plaintiff's intestate of that fact, yet if the deceased had knowledge of the vicious propensities and character of the horse, the plaintiff could not recover. In response to the request the court in effect said the jury could take that into consideration. This was not equivalent to charging what had been requested. An exception was taken by defendants' counsel and the court was again asked to charge that if the jury finds the intestate had knowledge of the propensities and character of the horse, plaintiff could not recover. In response to this request the court said the jury may say so. That was not equivalent to charging what was requested.

The judgments appealed from, therefore, should be reversed and a new trial granted, with costs to abide event.

HISCOCK, Ch. J., COLLIN, HOGAN, CRANE and ANDREWS, JJ., concur; CHASE, J., concurs in result.

Judgments reversed, etc.